UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FAIR HOUSING CENTER
OF METROPOLITAN DETROIT,

           Plaintiff,

    v.

AMERICAN HOUSE SENIOR
LIVING, LLC,

          Defendant.

_____/

Case No. 21-11061

Hon. George Caram Steeh

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (ECF NO. 83)

Defendant, American House Senior Living, LLC, seeks summary

judgment on Plaintiff's claims of disability discrimination under various

federal and state statutes. For the reasons explained below, Defendant's

motion is granted.

## BACKGROUND FACTS

Plaintiff Fair Housing Center of Metropolitan Detroit ("Fair Housing

Center") is a nonprofit organization dedicated to ensuring equal access to

housing. Plaintiff investigated several nursing homes and assisted living

facilities in the metropolitan Detroit area to determine whether the facilities

offer American Sign Language ("ASL") interpreters for prospective

-1-

residents who are deaf. One of those facilities is American House Senior Living, LLC ("American House"), located in Grosse Pointe Farms, Michigan. Plaintiff alleges that American House violated the Fair Housing Act, Affordable Care Act, Rehabilitation Act, and Michigan Persons with Disabilities Civil Rights Act by refusing to provide ASL interpreters for prospective deaf residents.

To support its mission, the Fair Housing Center conducts training and outreach and investigates housing discrimination complaints. The Center is primarily funded through grants from the U.S. Department of Housing and Urban Development (HUD) and local municipalities. These grants require that the Center investigate complaints, provide outreach and education, and conduct testing to determine compliance with fair housing laws.

In this case, the Fair Housing Center decided to test whether various local senior living facilities would provide an ASL interpreter to prospective deaf residents.[1] As part of that program, the Center sent testers to American House, which provides independent apartments, assisted living, and memory care to seniors. American House offers various activities and

---

[1] "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages. In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *E.E.O.C. v. UPS Supply Chain Solutions.*, 620 F.3d 1103, 1105 (9th Cir. 2010).

services, depending upon the resident's required level of care, including meals, administering medication, physical therapy, and enrichment activities. Independent living is considered a traditional landlord-tenant relationship, whereas American House's assisted living and memory care units are state-licensed facilities. In those facilities, American House conducts a health assessment to determine what accommodations may be needed and creates a plan with input from the resident's doctor. ECF No. 83-3 at PageID 1987-88.

Tester 1 visited American House on May 23, 2019. Tester 1 was instructed to pose as a relative looking for a one-bedroom apartment for her brother and to "mention that your brother is deaf (severe hearing loss) and you want to know if the complex (establishment) has an American Sign Language interpreter available to assist him." ECF No. 83-19. During the visit, Tester 1 spoke with Lois Ryzyk, telling her that the apartment was for his brother, who "was probably not best living at home. Told her that he was on blood pressure meds but was still in fairly good shape." ECF No. 83-12. Tester 1 also told Ryzyk that his brother was deaf and asked if "their staff was trained in American Sign Language interpretation." *Id.* Ryzyk "said she did not think so, but would check & text me the answer. She asked if he could read lips and if he used a hearing aid (she said lots do and they

talk loud to them)." *Id.* It is not clear from the record how Tester 1 answered these inquiries regarding his brother's abilities. Ryzyk took Tester 1 on a tour and explained that while they had studios available, they did not have any one-bedroom apartments. Tester 1 told Ryzyk that he would need to discuss the application with his brother; and Ryzyk promised to get back to him with an answer about the ASL interpreter. Ryzyk did not do so, however.

Tester 2 contacted American House by telephone, and was instructed to state that her grandmother was deaf and to ask "if there is an American Sign Language (ASL) interpreter available." ECF No. 83-23. Tester 2 spoke with "Pat" and inquired about independent and assisted living. Tester 2 told Pat that her grandmother is deaf and asked, "is there an ASL interpreter available?" *Id.* Pat said, "I don't know, but my initial thought is no." *Id.* She put Tester 2 on hold, saying "let me check with my Executive Director." *Id.* Pat returned to say, "no. But we have a lot of hard of hearing clients and interactive things are done to communicate." *Id.* When Tester 2 asked if "any accommodations could be made," Pat transferred her to the Executive Director, Anne Sadler.

When Sadler picked up the phone, she explained that it was hard to hear but that she did overhear some of Tester 2's conversation with Pat.

-4-

Tester 2 asked if there are "any accommodations available for my deaf Grandmother" and Sadler said that "as a traditional landlord we don't provide care that way. We don't provide that service." *Id.* Tester 2 asked if "accommodations are made for people in assisted living?" and Sadler replied that "it's probably the same for assisted living." Sadler said that "even if we did have a staff who knows ASL 'we can't know long they'll work here' and that they 'can't guarantee someone knowing ASL would be available all the time and I don't know where you'll find that.'" *Id.* Tester 2 "thanked Anne for her time and ended the call." *Id.*

Tester 3 was instructed to inquire about a one or two-bedroom apartment for her grandfather. Tester 3 was to inform the agent that her grandfather "was born deaf and cannot lipread, read or write English," and ask whether the facility would provide an ASL interpreter "during medical discussions or other special occasions at the facility, not on a daily basis." ECF No. 83-24. Tester 3 phoned American House to inquire about an apartment in assisted living, stating that her grandfather was deaf and "in need of an ASL interpreter." ECF No. 83-14. She spoke with Danielle Cichocki. "I asked her if they have someone on staff? She said she wasn't sure off the top of her head but she knows that one of their residents is blind and they've made special accommodations for him. Their goal is to

'meet people where they are' and provided specialized services to meet their needs." *Id.* Cichocki offered to email a brochure to Tester 3, who thanked her and ended the call.

<u>LAW AND ANALYSIS</u>

I.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Dist. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In response to a properly supported motion for summary judgment, the opposing party must come forward with specific evidence showing there is a genuine issue of fact for trial. *Anderson*, 477 U.S. at 252.

II. <u>Standing</u>

Defendant argues that Plaintiff lacks standing to bring this action. Standing is a jurisdictional requirement: "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction has the burden of demonstrating the three elements of standing: (1) an injury in fact, (2) fairly traceable to the action of the defendant, that (3) is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Each element of standing must be supported with the "manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 561.

An organization may assert standing as the representative of its members or on its own behalf, as the Fair Housing Center does here. *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332-33 (6th Cir. 2002). An organization may establish standing on its own behalf if "it has suffered a palpable injury as a result of the defendants' actions." *Id.* In the context of

Fair Housing Act claims, "the circuits generally agree that an organization meets Article III standing requirements where it can show that the defendant's alleged violations of the Fair Housing Act caused it to divert resources from other projects or devote additional resources to a particular project in order to combat the alleged discrimination." *Fair Housing Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 Fed. Appx. 469, 474 (6th Cir. 2006). *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982) (plaintiff organization had standing under FHA when it alleged that racial steering practices impaired its ability to provide counseling and referral services and that it had "to devote significant resources to identify and counteract" those practices). However, the plaintiff must "show some injury that is independent of the costs of litigation." *Id.*; *see also Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993). In *Hooker*, the Sixth Circuit found that a housing organization had standing when it "devoted resources to investigating defendants' practices" by sending a tester. Similarly, in *Olde St. Andrews*, the court determined that "the resources that the Fair Housing Council directed toward training and employing testers to investigate the Village of Olde St. Andrews constitutes a concrete injury." *Olde St. Andrews*, 210 Fed. Appx. at 478.

Defendant argues that the Fair Housing Center cannot establish that it was injured because it (1) investigated American House without prior complaint; and (2) used funds from HUD that required it to conduct testing, so there was no actual diversion of resources. These arguments have been rejected by the Sixth Circuit in similar cases. In *Old St. Andrews*, the court found a diversion of resources, constituting an injury, even though the housing organization received a HUD grant requiring it to conduct testing. *Id.* at 477. The court reasoned that "[i]f the Fair Housing Council had not expended time and money on testing at Olde St. Andrews, it could have used those monies for other testing." *Id.* In addition, the court found that a housing organization could have standing even if it conducted testing on its own initiative, without prior complaint. *Id.* at 478. Defendant has not meaningfully distinguished *Old St. Andrews* or *Hooker*. Moreover, the Sixth Circuit has recently reaffirmed the principle that an organization suffers an injury when it "diverted resources that could have been expended elsewhere" in response to a defendant's conduct.[2] *See Online Merchants Guild v. Cameron*, 995 F.3d 540, 548 (6th Cir. 2021).

---

[2] Defendant relies upon out-of-circuit cases and *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020) for the proposition that the Center cannot have standing because its expenditures fall within its usual mission to combat housing discrimination. "But *Shelby Advocates* stands for no such thing, because that would contradict the various earlier – and thus controlling – cases to the contrary from this circuit, not to mention Supreme Court precedent, all of which affirm that within-mission

In this case, the Fair Housing Center conducted testing and, after allegedly uncovering discriminatory practices, conducted outreach and education by posting on social media, placing advertisements, and publishing an article to counteract those practices. The Center has demonstrated that it devoted resources to testing for discriminatory practices and counteracting those alleged practices. Under binding Sixth Circuit precedent, the Fair Housing Center has established a sufficiently concrete injury to confer organizational standing.

### III.  Applicability of Rehabilitation Act and Affordable Care Act

The Fair Housing Center alleges that American House failed to accommodate the needs of deaf individuals, in violation of the Fair Housing Act ("FHA"), Persons with Disabilities Civil Rights Act ("PWDCRA"), Rehabilitation Act ("RA"), and Affordable Care Act ("ACA"). The RA and ACA apply only to those entities or programs "receiving Federal financial assistance." *See* 29 U.S.C. § 794(a) (RA); 42 U.S.C. § 18116 (ACA). "Courts interpreting [section] 504 of the Rehabilitation Act have consistently construed 'Federal financial assistance' to mean the federal government's provision of a subsidy to an entity, not the federal government's

---

organizational expenditures are enough to establish direct organizational standing." *Online Merchants*, 995 F.3d at 548.

compensation of an entity for services provided." *Abdus-Sabur v. Hope Vill., Inc.*, 221 F. Supp. 3d 3, 9 (D.D.C. 2016). The RA and ACA apply to the intended recipient of the federal funds, not to a mere beneficiary. "Congress limited the scope of § 504 [of the Rehabilitation Act] to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). "By limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." *Id.* at 606.

Plaintiff asserts that American House accepts federal funds in the form of veterans' benefits and Medicaid. *See generally Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1042 (5th Cir. 1984) ("We hold that Medicare and Medicaid are federal financial assistance for the purpose of Section 504 [of the RA].")." Anne Sadler testified, however, that American House does not accept Medicare or Medicaid. ECF No. 83-4 at PageID 2111. Plaintiff has not sufficiently rebutted this testimony. Although Plaintiff points to American House's general website (ECF No. 84-13), which discusses Medicaid assisted living benefits in Michigan, the website also states that "Medicaid

programs are not available at all American House locations." *Id.* Plaintiff

provides no evidence that, contrary to Sadler's testimony, American House

Grosse Pointe accepts Medicaid payments on behalf of its residents.

Likewise, American House is not a recipient of veterans' benefits. The

funds are paid to veterans, who may use them to pay for rent or services at

American House or as they please. ECF No. 83-3 at PageID 2006-2007.

Although American House may benefit by receiving payments from

veterans who are residents, it does not receive federal financial assistance.

*See Paralyzed Veterans*, 477 U.S. at 607. As the Supreme Court

explained, "[t]he statute covers those who *receive* the aid, but does not

extend as far as those who *benefit* from it. In *Grove City* we recognized that

most federal assistance has 'economic ripple effects.' We rejected the

argument that those indirect economic benefits can trigger statutory

coverage." *Id.* Accordingly, American House is not subject to the RA or

ACA.[3]

---

[3] Even if the RA and ACA were applicable to American House, the failure-to-accommodate analysis is substantially similar to that under the Fair Housing Act and Persons with Disabilities Civil Rights Act. *See Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001) ("Because the Fair Housing Act adopted the concept of a "reasonable accommodation" from § 504 of the Rehabilitation Act, 29 U.S.C. § 791, cases interpreting that term under the Rehabilitation Act also apply to claims under the Fair Housing Act."); *Bachman v. Swan Harbour Ass'n*, 252 Mich. App. 400, 417, 653 N.W.2d 415, 428 (2002) (interpreting PWDCRA parallel provision consistently with FHA); *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926

IV.    Failure to Accommodate under FHA and PWDCRA

The Fair Housing Act makes it unlawful to discriminate against "any

person in the terms, conditions, or privileges of sale or rental of a dwelling,

or in the provision of services or facilities in connection with such dwelling,"

on the basis of that person's handicap. 42 U.S.C. § 3604(f)(2)(A).

Discrimination prohibited by the Act includes the refusal to make

reasonable accommodations in "rules, policies, practices, or services, when

such accommodations may be necessary to afford [the handicapped

individual an] equal opportunity to use and enjoy a dwelling." 42 U.S.C.

§ 3604(f)(3)(B).[4] To establish a reasonable accommodation claim, a plaintiff

must show that (1) she is disabled, (2) she requested an accommodation,

(3) the defendant housing provider refused to make the accommodation,

(4) the accommodation was reasonable and necessary, and (5) the

defendant knew or should have known about the disability at the time of the

refusal. *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541

(6th Cir. 2014). "Accommodations required under the Act must be both

reasonable and necessary to afford the handicapped individual an equal

---

F.3d 235, 241 (6th Cir. 2019) (the ACA, 42 U.S.C. § 18116, incorporates anti-
discrimination provisions of the RA).

[4] The PWDCRA contains a parallel provision. *See* M.C.L. § 37.1506a(1)(b); *Bachman*,
252 Mich. App. at 417.

opportunity to use and enjoy a dwelling." *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1043-44 (6th Cir. 2001). "An accommodation is 'reasonable' when it imposes no 'fundamental alteration in the nature of the program' or 'undue financial and administrative burdens.'" *Howard v. City of Beavercreek*, 276 F.3d 802, 805-06 (6th Cir. 2002) (citation omitted). "In order to prove that an accommodation is 'necessary,' '[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.'" *Id.* (citation omitted). The plaintiff has the burden of demonstrating the reasonableness and necessity of a requested accommodation. *Hollis*, 760 F.3d at 543. "Whether a requested accommodation is required by law is 'highly fact-specific, requiring case-by-case determination.'" *Groner*, 250 F.3d at 1043-44 (citation omitted).

In this case, the Center's testers inquired whether American House had an ASL interpreter on staff or "available" for their deaf relatives. The law is clear, and the Fair Housing Center does not dispute, that providing an ASL interpreter is not the only way to ensure effective communication or to accommodate a deaf individual. *See* 28 C.F.R. § 36.303 (listing

examples of various "auxiliary aids and services").[5] The Center also appears to concede that the law does not require a housing provider such as American House to have an ASL interpreter on staff, but to provide one if the circumstances require to ensure a deaf person has an equal opportunity to enjoy the housing of their choice. "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303; *see, e.g., Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 342-43 (11th Cir. 2012) ("[T]he simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights under the RA. Indeed, construing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid.").

---

[5] "Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." 28 C.F.R. § 36.303 (ADA regulation). *See also* 45 C.F.R. § 92.102 (ACA regulation regarding effective communication).

Through its testing, the Center failed to articulate the circumstances under which an ASL interpreter would be necessary. Testers asked whether an interpreter was available or on staff, but did not develop facts indicating the necessity of such an arrangement. Testers did not provide any information regarding their relatives' abilities, or explain the type of communications for which an interpreter would be necessary.[6] *See Southwest Fair Hous. Council v. WG Chandler Villas SH LLC*, 2021 WL 1087200, at *10, *13-14 (D. Ariz. Mar. 22, 2021) (senior apartment complex did not violate FHA or ADA by failing to offer ASL interpreter, when tester indicated that she communicated with her deaf grandfather through written notes and  facility did not offer "complex services" that would require an interpreter). Given that the necessity of an ASL interpreter is context-dependent, the testers' inquiries failed to provide sufficient information for the court – or a jury – to engage in the "highly fact-specific . . . case-by-case determination" of whether the requested accommodation was required by law. *Groner*, 250 F.3d at 1043-44. *See also Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 107 (3d Cir. 2018) ("[T]he Act's

---

[6] Perhaps recognizing this flaw, the Center modified its testing protocol and directed Tester 3 to say that her grandfather "was born deaf and cannot lipread, read or write English," and ask whether the facility would provide an ASL interpreter "during medical discussions or other special occasions at the facility, not on a daily basis." ECF No. 83-24. Tester 3's report does not indicate that she followed this script.

necessity element requires that an accommodation be essential, not just preferable.").

The Center suggests that "it is not difficult to imagine" situations in which an ASL interpreter would be necessary, such as conversations related to medical services or signing the lease with the facility. But this is not what the testers requested. Moreover, it is the Center's burden to prove necessity, not invite the trier of fact to speculate about it. Even in the hospital context, the necessity of an ASL interpreter is not a given as a matter of law. *See Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 835 (11th Cir. 2017) (effective communication "does not mean that deaf patients are entitled to an on-site interpreter every time they ask for it"); *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 870 (9th Cir. 2022) ("We do not apply categorical rules to determine which auxiliary aids are required to achieve effective communication.").

The Center argues that American House "failed to offer Plaintiff's Testers an ASL interpreter for any occasion," which suggests "a categorical exclusion of deaf persons." ECF No. 84 at PageID 2672-73. The Center points to Sadler's statement to Tester 2 that "[w]e don't provide that service" as evidence that American House would not provide an ASL interpreter under any circumstances. ECF No. 83-23. However, in context,

-17-

it is clear that Sadler is responding to a request for an interpreter *on staff*, as Sadler explained that "even if we did have a staff who knows ASL 'we can't know long they'll work here' and that they 'can't guarantee someone knowing ASL would be available all the time and I don't know where you'll find that.'" *Id.*

Moreover, assuming American House failed to offer an interpreter for any occasion, it remains the Center's burden to show that an interpreter was necessary. *See Hollis*, 760 F.3d at 543 ("The ultimate burden to prove both reasonableness and necessity . . . lies always with the plaintiff."). A refusal to provide an accommodation or explore alternatives, without a showing of necessity, does not create liability under the FHA. *See Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1192 (9th Cir. 2021) (rejecting argument that a landlord faces "standalone" liability "when it fails to engage in an interactive process with a disabled tenant" regardless of necessity); *Groner*, 250 F.3d at 1047 ("[W]hile some courts have imposed an obligation on employers and employees to engage in an interactive process, there is no such language in the Fair Housing Act . . . that would impose such a duty on landlords and tenants."); *see also Keys Youth Servs., Inc. v. City of Olathe, KS*, 248 F.3d 1267, 1275 (10th Cir. 2001) (a defendant "cannot be

liable for refusing to grant a reasonable and necessary accommodation if the [defendant] never knew the accommodation was in fact necessary").

Because Plaintiff has not shown that it requested a necessary accommodation, Defendant is entitled to summary judgment on Plaintiff's reasonable accommodation claims under the FHA, PWDCRA, and, to the extent applicable, the RA and ACA.

V.   Discriminatory Statement under FHA and PWDCRA

Plaintiff also asserts a claim under 42 U.S.C. § 3604(c), which makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." *Id*. (FHA). The PWDCRA contains a similar provision, prohibiting discrimination against a buyer or renter on the basis of disability. M.C.L. § 37.1502. In determining whether a statement is unlawful under § 3604(c), courts consider whether the statement indicates to an objective "ordinary listener" a preference, limitation, or discrimination based upon a protected class. *Campbell v. Robb*, 162 Fed. Appx. 460, 466 (6th Cir. 2006). The statement at issue "must be taken in context." *Mercer v. Edward*

*Rose & Sons, Inc.*, No. 21-11336, 2023 WL 2789621, at *6 (E.D. Mich. Apr. 5, 2023); *Fair Hous. Res. Ctr., Inc. v. DJM's 4 Reasons Ltd.*, 499 Fed. Appx. 414, 416 (6th Cir. 2012).

Plaintiff argues that Sadler's statements regarding an ASL interpreter, that American House does not "provide care that way" or "provide that service," are unlawful under § 3604(c). According to Plaintiff, these statements could be construed as excluding deaf individuals who need interpreters from American House. As noted above, Sadler statements refer to the availability of an ASL interpreter on staff. At most, Sadler refused a requested accommodation; her statements themselves do not directly or indirectly suggest discrimination or a preference for nondisabled tenants. Under these facts, a reasonable jury could not find a violation of § 3604(c).

ORDER

For all of the foregoing reasons, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Dated: November 28, 2023          s/George Caram Steeh
                                  Hon. George Caram Steeh
                                  United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
November 28, 2023, by electronic and/or ordinary mail.

s/Michael Lang
Deputy Clerk